UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NEW HAMPSHIRE, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00282-JL |
| | ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEFENDANT'S MEMORANDUM (I) IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND (II) IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION.

On June 7, 2023, Plaintiff filed an amended complaint pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of United States Customs and Border Protection ("CBP") records regarding CBP apprehensions in New Hampshire from October 1, 2022, through January 31, 2023. DN 6. On July 14, 2023, Defendant moved for summary judgement, arguing that FOIA Exemptions (b)(6), (b)(7)(C), (b)(7)(E), and (b)(7)(F) exempted the responsive information from disclosure. DN 9. On August 10, 2023, Plaintiff objected to Defendant's motion for summary judgment, DN 12, and cross-moved for summary judgment, DN 11.

As set forth in Defendant's motion for summary judgment, there are no issues of material fact in this case, and the facts establish that CBP is entitled to judgment as a matter of law. This Court should therefore enter summary judgment for Defendant.

II.    DEFENDANT HAS PROPERLY APPLIED FOIA EXEMPTIONS
       TO THE RESPONSIVE DOCUMENTS.

    As Defendant argued in its motion for summary judgment, it is properly withholding

information from the responsive records such as names, addresses, dates of birth, personal

identification numbers (such as alien registration numbers and fingerprint identification

numbers), employment history, medical history, and other personal data.  DN 9-1 at 6.  Plaintiff

asserts in its objection that this is a red herring, because it is not seeking any of this identifying

information.  Plaintiff is incorrect, as records responsive to its request are replete with this

information.

    Plaintiff's April 5, 2023, FOIA request to CBP sought the following information:

    1.    **Records sufficient** to identify how many of the apprehensions from
          October 1, 2022 to December 31, 2022 occurred in New Hampshire –
          including in the New Hampshire counties of the Swanton sector (Coos,
          Grafton, and Carroll Counties) – relative to the total number of
          apprehensions by the sector during that three-month time period;

    2.    Of these October 1, 2022 to December 31, 2022 apprehensions in New
          Hampshire identified in Request No. 1, **records sufficient** to identify (i)
          the municipality where the apprehension occurred, and (ii) the nationality
          of the person apprehended;

    3.    **Records sufficient** to identify how many of the 367 January 2023
          apprehensions occurred in New Hampshire, including in the New
          Hampshire counties of the Swanton sector (Coos, Grafton, and Carroll
          Counties); and

    4.    Of these January 2023 apprehensions in New Hampshire identified in
          Request No. 3, **records sufficient** to identify (i) the municipality where
          the apprehension occurred, and (ii) the nationality of the person
          apprehended.

DN 6-1 at 2 (emphasis added).  Plaintiff did not simply ask for statistics or specific data.  They

requested "records" about the apprehensions, the nationality of the subjects, and the

municipalities where the apprehensions occurred. *Id.* These records contain extensive personal information of the individuals involved in the apprehensions.

Upon receipt of Plaintiff's FOIA request, Defendant considered the functions of each office within CBP and determined that the U.S. Border Patrol ("USBP") was the most likely source of responsive records. Supplemental Declaration of Melissa Pansiri ("Pansiri Dec."), attached as Exhibit A, ¶ 4. USBP searched the Enforcement Integrated Database ("EID"), which contains information regarding the identification, investigation, apprehension, and removal of individuals encountered during USBP operations, including the nationalities of the apprehended subjects. *Id.*, ¶ 5. USBP accesses EID using a software application called the ENFORCE Apprehension Booking Module ("ENFORCE"). *Id.* USBP determined that querying ENFORCE was the best way to locate responsive records regarding apprehensions and encounters and identifying the municipality where each apprehension occurred. *Id.* These records are the Beecher Falls Station apprehension log records ("Apprehension Logs") and the Records of Deportable/Inadmissible Alien ("I-213 Form"). *Id.*

Although Plaintiff asserts that "the requested information does not include any information that would implicate the privacy of Defendant's personnel," DN 11-1 at 12, and further states "Plaintiff's Request does not implicate or reference a single individual's name," *id.* at 13, Plaintiff is incorrect. Based on the broad language in Plaintiff's FOIA request – including "records about" and "records sufficient" to identify the requested information – the responsive records, the Apprehension Logs and I-213 Forms, do include personal information about CBP personnel and other third parties.

Plaintiff does not challenge the applicability of FOIA Exemptions 6 and 7(C) on any legal basis, but only on the grounds that the exemptions are inapplicable to Plaintiff's request.

Plaintiff reaches this conclusion based on the self-serving determination that its requests for "records about" and "records sufficient" to identify the requested information somehow do not include those records themselves, but only specific information contained within those records. Such a narrow interpretation of such a broad FOIA request is inappropriate.

The withheld responsive records all contain personally identifying information consistently redacted by CBP pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).  Pansiri Dec., ¶ 7.  Specifically, the Apprehension Logs include personal information such as the names of the apprehending USBP Agents and the names and other identifying information of the individuals apprehended, such as their names, A-File numbers, and Fingerprint Identification Numbers.  *Id.* The municipality where the apprehensions occurred is only shown on the corresponding I-213 Forms.  *Id.*  The I-213 forms contain the names of USBP Agents and even more personal information about the individual apprehended including their name, birthdate, address, photograph, fingerprints, parents' names, A-File number, Fingerprint Identification Numbers, other identification card numbers (e.g., driver's license numbers), and other personal identifying information such as physical descriptions and characteristics, employment information, phone numbers, criminal history, marital status, names of other family members, license plate numbers, and vehicle information of subjects and third parties mentioned in the records.  *Id.*

As Plaintiff recognizes, courts have long held that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (quoting *Branch v. FBI*, 658 F. Supp. 204, 209 (D.D.C. 1987)).  Plaintiff appears to have made a determination that its request for "records about" and "records sufficient" to identify the requested information includes only the requested information itself, and that Defendant should have known that when

responding to the request.  However, the "records about" the information Plaintiff seeks and the "records sufficient" to obtain the information Plaintiff seeks are the Apprehension Logs and I-213 Forms.  Those logs and forms contain extensive personal identifying information about a host of individuals.  *See* Pansiri Dec., ¶ 7.  The privacy interests of the individuals mentioned in the responsive records outweigh any possible public interest in disclosure of their identities and any identifying information.  Accordingly, the Court should hold that Defendant properly applied Exemptions (b)(6) and (b)(7)(C) in withholding personal information from the responsive records.

III.     RELEASE OF THE REQUESTED INFORMATION WOULD IMPLICATE
         GUIDELINES, TECHNIQUES, AND PROCEDURES FOR LAW ENFORCEMENT
         INVESTIGATIONS OR PROSECUTIONS.

In Defendant's June 2, 2023, response to Plaintiff's FOIA appeal, it sets forth in detail how the use of statistics sought by Plaintiff serves as a guideline that determines Agency allocation of resources.  DN 6-2.  As set forth in that letter, "the station level apprehension information [sought by Plaintiff in its FOIA request] serves as guidelines for CBP because the numbers allow the agency to track the effectiveness of each station in its enforcement and operational objectives and in the overall law enforcement objectives of CBP, and further, serves as a tool to determine the allocation of resources to effectively accomplish these objectives."  *Id.* at 6.

While not specifically raised in the June 2, 2023, response letter, recent caselaw establishes that Station level statistics sought by Plaintiff also constitute law enforcement techniques and procedures.  In *Am. Immigration Council v. U.S. Immigration and Customs Enforcement*, 464 F. Supp. 3d 228, 244-45 (D.D.C. 2020), the court granted summary judgment in favor of the agency withholding data detailing where individuals were apprehended or

encountered pursuant to Exemption 7(E).  And, in *American Civil Liberties Union of Maine Foundation v. U.S. Dep't of Homeland Security*, 2:18-cv-00176-JDL, 2019 WL 2028512, *4 (D. Me. May 8, 2019), the court found the agency properly withheld information pursuant to Exemption 7(E) when the information revealed current law enforcement capabilities.

Plaintiff claims that the withheld information cannot be found to constitute techniques and procedures for law enforcement investigations or guidelines for law enforcement investigations or prosecutions.  Plaintiff bases its argument, in part, on how it defines these terms.  In its motion, however, Plaintiff immediately contradicts its first definition of techniques, procedures, and guidelines with a subsequent definition that would in fact include Station level statistics as law enforcement techniques and procedures.  Plaintiff cites *Families for Freedom v. U.S. Customs & Border Protection*, 837 F. Supp. 2d 287, 299 (S.D.N.Y. 2011) to say that techniques and procedures do not include "policy and budgetary choices about the assignment of personnel," and "[t]he words do not refer to the staffing decisions defendants made years ago." DN 11-1 at 15.  Plaintiff cites a different ruling from the *Families for Freedom* case, 797 F. Supp. 2d 375, 391 (S.D.N.Y. 2011), where the court ordered the release of "six Buffalo Sector Daily Reports that indicate the total number of all arrests made by the Rochester Station for each year …" because "[s]uch statistics are neither 'techniques or procedures' nor 'guidelines' …" DN 11-1 at 16.  In the following paragraph, however, Plaintiff then states that "'guidelines' refer to the means by which agencies allocate resources for law enforcement investigations (namely whether to investigate), while 'techniques and procedures' refer to the means by which agencies conduct investigations (namely, how to investigate)."  DN 11-1 at 16-17 (citing *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010)).  Allocation of resources are precisely the means by which agencies, including CBP,

conduct investigations and includes strategic distribution of limited operational resources. Station level statistics reveal how CBP conducts investigations and allocates resources because the statistics show where Agency resources are needed which then shows where Agency resources are and are not deployed.

Furthermore, Plaintiff cites an analogy that further supports how Station level statistics also constitute techniques and procedures.  The court in *Lowenstein* used the analogy that a law enforcement agency directing staff to bring charges when tax evasion concerns $100,000 or more is a "guideline" and targeting cash-based businesses for tax evasion when there is knowledge that these types of businesses are more likely to evade taxes is a "technique."  DN 11-1 at 16-17. Here, knowing the number of CBP apprehensions in a certain location is the same type of background knowledge as knowing that cash-based businesses are more likely to evade taxes – allowing law enforcement to target patterns of criminal activity.  Therefore, release of Station level statistics would similarly be a "technique" because it shows the exact distribution of encounters and would shed light on the CBP resources allocated to address those encounters based off this expected distribution across Stations.

Plaintiff even admits that current staffing levels could fall under the category of guidelines.  Specifically, Plaintiff again cites *Families for Freedom*, 837 F. Supp. 2d at 299, quoting "[a]lthough current or prospective staffing statistics could arguably fall under the definition of 'guidelines,' plaintiffs seek historical statistics."  DN 11-1 at 17.  Here, however, Plaintiffs **are** seeking information revealing current staffing levels.  The FOIA request asked for statistics from October 2022 to January 2023.  These recent data would illustrate current staffing levels, and would therefore qualify as guidelines.  Therefore, the withheld information is exempt

from disclosure pursuant to 5 U.S.C. § 552(b)(7)(E).  The Court should therefore grant summary judgment to Defendant.

IV.    <u>PLAINTIFF'S INTERPRETATION OF AGENCY DATA IS INCORRECT</u>.

Plaintiff points to information available to the public on Defendant's website to bolster its argument that release of the responsive records could not be expected to risk circumvention of the law.  However, Plaintiff has misinterpreted and mischaracterized the information available on that website.  What the website actually shows is that Defendant does not release Station level enforcement data.  Pansiri Dec., ¶ 8.  This is specifically for the reasons argued in Defendant's motion for summary judgment.

There is only one USBP Station responsible for patrolling the entire state of New Hampshire, plus a part of Vermont – the Beecher Falls Station.  Pansiri Dec., ¶ 9.  Therefore, Plaintiff's FOIA request for records identifying the number of apprehensions in New Hampshire is a request for records revealing a sub-set of Station level enforcement data.  *Id.*  Swanton Sector has within its area of responsibility eight Stations throughout New York, Vermont, and New Hampshire.  *Id.*  Beecher Falls Station is the sole USBP Station with an area of responsibility in New Hampshire.  *Id.*  New York and Vermont each have multiple Stations, so a request for apprehension records from either of those states would not be a request for records revealing Station level enforcement data.  *Id.*  However, the current request by plaintiff for New Hampshire apprehension records necessarily results in  a request for records revealing Beecher Falls Station level enforcement data.  *Id.*

Plaintiff's claim that Defendant's website allows the public to obtain the total number of encounters in the Swanton Sector for each state within its area of responsibility is incorrect.  As support for its incorrect argument that Defendant releases Station level data on New Hampshire

encounters, Plaintiff cites to its Exhibit P, which contains screen shots from the Defendant's website.  None of the information in Exhibit P supports Plaintiff's contention that Defendant has previously released New Hampshire apprehension data.  The first two pages of that Exhibit show encounter records of the Swanton Sector, first in Vermont and second in New York.  DN 11-8 at 2-3.  What is missing, however, from Exhibit P, are encounter records for Swanton Sector for New Hampshire.  DN 118.  That is because the website does not allow you to filter Swanton Sector statistics and data for New Hampshire because that would reveal the statistics and data for one single Station – Beecher Falls.  Pansiri Dec., ¶ 10.  Although Plaintiff asserts that the third page of Exhibit P allows for a search of New Hampshire encounters, that assertion is inaccurate.  The third page of Exhibit P is filtered to New Hampshire encounters of the Boston Field Office.  DN 11-8 at 4; Pansiri Dec., ¶ 10.  The Boston Field Office is under the Office of Field Operations, not USBP.  Pansiri Dec., ¶ 10.  Therefore, the numbers shown from New Hampshire on Exhibit P are not USBP encounters, which is what Plaintiff requested.  *Id.*

Plaintiff makes much of the fact that Defendant has publicly released Sector level data in media releases, which encompasses apprehensions that have occurred in Vermont, New Hampshire, and Northern New York.  DN 11-1 at 18-20.  Plaintiff has not provided evidence that Defendant has released New Hampshire apprehensions publicly or that Defendant has provided Station level information.  *See* DN 11-1.  To support this argument, Plaintiff cites to Exhibit Q, DN 11-9, showing a Swanton Sector Twitter account, and cites four news articles from 2017 to 2022 covering multiple Sectors and Stations.  DN 11-1 at 18-20, n.10.  Most of the Swanton Sector tweets are regarding incidents in New York and Vermont which, as stated above, both have multiple Stations.  *Id.*  These tweets do not give Station level specific information, instead they provide a vague idea of Sector level activity.  *Id.*  Plaintiff cites the these tweets a second

time in footnote 12 of its memorandum.  *Id.* at 20, n.12.  The news articles Plaintiff cites also only give an overview of the Sector because the articles show a few incidents across multiple Sectors and Stations over the course of the last six years.  *Id.*  The first article from 2022 discusses one apprehension incident carried out by two New York USBP stations in the Buffalo Sector – not the Swanton Sector.  *Id.*  The second article from 2018 discusses 20 apprehensions throughout the Swanton Sector – naming four specific Stations but not providing any specific apprehension data for any specific Station.  *Id.*  The last two articles from 2017 discuss two checkpoints out of the New Hampshire Beecher Falls Station area of responsibility and those limited checkpoint operations that occurred over a three-day period about six years ago.  *Id.*

Defendant established in its motion for summary judgment why the responsive records were properly withheld in full pursuant to Exemptions (b)(7)(E) and (b)(7)(F).  Because Beecher Falls is the sole station responsible for patrolling the state of New Hampshire, CBP does not release Station level statistics regarding apprehensions.  Pansiri Dec., ¶ 12.  Access to Station level statistics for New Hampshire would endanger CBP personnel and other individuals, including innocent bystanders, within the Beecher Falls station and its area of responsibility, which encompasses the entire state of New Hampshire and parts of Vermont.  *Id.*  Because releasing the requested information would allow someone to construct a mosaic of CBP law enforcement techniques, procedures, and guidelines practiced within New Hampshire, the responsive records were properly withheld in full.  This statistical mosaic would effectively create a map for violators of the law to conduct their illegal activity, thereby leaving our nation's borders more vulnerable.  *Id.*  Finally, if armed with this information, non-citizens without legal status to enter or remain in the United States might avoid certain areas along the border or target other areas along the border to circumvent adherence to immigration law requirements.  *Id.*

In this case, protecting the number of apprehensions at the Station level in New Hampshire, to include the date, time, location, and number of apprehensions broken down by municipality and nationality, is critical to Defendant to ensure that potential law violators do not use this information to determine which areas within Swanton Sector are most vulnerable to exploitation. Pansiri Dec., ¶ 13. Disclosure of this information could result in harm to the life or physical safety of Border Patrol agents, CBP employees, or other individuals located within the Beecher Falls Station and its area of responsibility. *Id.* Releasing statistics that would create such a vulnerability would run afoul of CBP's critical security mission of safeguarding our country's borders. *Id.* Because releasing this information could reasonably be expected to endanger the life or physical safety of various individuals, the information is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(F). The Court should therefore grant summary judgment to the defendant.

V.    <u>CONCLUSION</u>.

The material facts of this case are not in dispute. As set forth in this memorandum, as well as the memorandum in support of Defendant's motion for summary judgment, DN 9-1, and the record of this litigation, those facts establish that CBP is entitled to judgment as a matter of law. The Court should therefore enter summary judgment in favor of CBP.

Respectfully submitted,


JANE E. YOUNG
United States Attorney


Dated:  September 28, 2023                    By: /s/ Michael McCormack
                                              Michael McCormack
                                              Assistant U.S. Attorney, NH Bar No. 16470
                                              United States Attorney's Office
                                              53 Pleasant Street
                                              Concord, NH  03301
                                              (603) 225-1552
                                              Michael.McCormack2@usdoj.gov